UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Neurotrope, Inc. Securities Litigation | Case No. 1-17-CV-03718-LGS<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 4

III. PARTIES .......... 5

IV. SUBSTANTIVE ALLEGATIONS: NEUROTROPE MISLED INVESTORS ABOUT THE EFFICACY OF BRYOSTATIN .......... 6

- A. Background .......... 6
- B. Neurotrope Repeatedly Inflated Investors' Expectations About the Efficacy of Bryostatin .......... 7
- C. Neurotrope Shortened the Phase 2b Trial to Twelve Weeks, and Completed the Trial and Received Trial Results Months Before the Start of the Class Period .......... 9
- D. Defendants Blatantly Misled Investors by Stating that the Phase 2b Clinical Data Demonstrated Bryostatin Was Effective When, in Fact, the Data Failed To Show a Statistically Significant Effect .......... 9
- E. Neurotrope Revealed Data Failing To Show that Bryostatin-1 Had Any Statistically Significant Effect on Alzheimer's Disease .......... 12

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS .......... 14

VI. LOSS CAUSATION .......... 18

- A. May 1, 2017 .......... 19
- B. July 19, 2017 .......... 19

VII. ADDITIONAL SCIENTER ALLEGATIONS .......... 20

VIII. CLASS ACTION ALLEGATIONS .......... 23

IX. NO SAFE HARBOR .......... 25

X. COUNT ONE .......... 26

Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants .......... 26

XI. SECOND CLAIM .......... 27

Violation of Section 20(a) of The Exchange Act Against the Individual Defendants .......... 27

XII. PRAYER FOR RELIEF .......... 28

XIII. JURY TRIAL DEMANDED .......... 29

Lead Plaintiffs David Hovasse and Leon Kurdziel, Jr. ("Lead Plaintiffs" or "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Neurotrope, Inc. ("Neurotrope" or the "Company"), analysts' reports and advisories about the Company, consultation with an expert and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. INTRODUCTION

1. This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired Neurotrope securities between January 30, 2017, and July 18, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Neurotrope is a clinical stage biopharmaceutical company specializing in the development of therapeutics to treat neurodegenerative diseases, including Alzheimer's disease ("Alzheimer's" or "AD").

3. Plaintiffs bring this action because during the Class Period, Defendants blatantly misled investors about the efficacy of its lead product candidate for the treatment of Alzheimer's, Bryostatin-1 (also referred to as "Bryostatin").

4. After reporting purportedly positive results from the Phase 1 and 2a clinical trials, on January 7, 2016, Neurotrope initiated a Phase 2b clinical trial designed to evaluate the safety, tolerability and efficacy of Bryostatin in the treatment of patients with moderately severe to severe Alzheimer's. The Phase 2b trial enrolled 147 patients in a randomized, double-blind, placebo-controlled study and tested Bryostatin with two dosage levels: 20 µg and 40 µg.

5. The primary outcome by which the effectiveness of Bryostatin was to be evaluated, *i.e.*, the "efficacy endpoint" of the trial, was the Severe Impairment Battery ("SIB") and the secondary efficacy endpoints were the Mini Mental State Exam ("MMSE"), Activity of Daily Living ("ADL") and Neuropsychiatric Inventory scale ("NPI").

6. Patient enrollment was completed on November 22, 2016. Clinical data from a trial typically will be available within a short period after the trial is fully enrolled.

7. Even prior to the beginning of the Class Period, Neurotrope inflated investor expectations about the likely efficacy of Bryostatin. For example, Neurotrope repeatedly made statements such as the following:

- That "Neurotrope is at the forefront of developing a novel therapy to treat and potentially reverse moderate to severe Alzheimer's dementia and other neurodegenerative diseases. The Company's world-class science is a paradigm shifting approach that treats some of the underlying causes of Alzheimer's disease;"

- That Neurotrope "may have a breakthrough in Alzheimer's disease and other neurological disorders."

8. At the beginning of the Class Period, on January 30, 2017, Neurotrope announced at an investor conference that, based on "preliminary clinical . . . patient data" from the Phase 2b study, "we see remarkable results in the reversal of Alzheimer's."

9. On February 13, 2017, at a time months after Neurotrope had completed patient treatment in the Phase 2b study and had had ample time to analyze the data from that study, Neurotrope announced at an investor conference:

> We are pretty excited about our upcoming Phase 2 top-line data in April 2017, as I said in moderate to severe Alzheimer's patients, which we believe will be a pivotal inflection point—valuation inflection point—for the Company . . . . We have extensive preclinical data, clinical data, and compassionate use data that leads us to believe that our mechanism of action can be very effective in reversing Alzheimer's disease.

10. Neurotrope made additional misleading statements on March 24, 2017 suggesting that Neurotrope had "demonstrated" the efficacy of Bryostatin-1 in combatting Alzheimer's disease.

11. In fact, neither Neurotrope's Phase 2b trial, nor any other study of Bryostatin-1, has ever demonstrated the efficacy of this drug in combatting Alzheimer's disease. On May 1, 2017, Neurotrope issued a press release announcing what it claimed were "positive top-line results" of the pivotal Phase 2b trials of Bryostatin. Defendant Daniel Alkon, Neurotrope's President and Chief Scientific Officer, characterized the results as showing "improvement in patients with moderate to severe Alzheimer's disease." However, the underlying trial data Neurotrope included (in part) in the press release flatly contradicted Neurotrope's characterizations of the results as positive. Neurotrope's study of the 20 µg dose of Bryostatin failed to demonstrate that the drug had a statistically significant effect on clinical measures of Alzheimer's disease, including the study's primary and secondary efficacy endpoints, under broadly accepted industry standards for statistical significance.

12. On this news, Neurotrope's share price fell by approximately 63%.

13. In its May 1, 2017 press release, Neurotrope continued to mislead the public about the efficacy of Bryostatin by continuing to tout the purported benefits of Bryostatin, while failing to disclose any data from its study of the 40 µg dose of Bryostatin, data that further contradicted Neurotrope's claims. On July 19, 2017, Neurotrope finally presented the full results of its Phase 2 study of Bryostatin-1, including the results of the Phase 2b trial using a 40 µg dosage, and revealed to investors that "there was no therapeutic signal observed with the 40 µg dose."

14. On this news, Neurotrope's share price fell by approximately 24%.

15. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

16. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Neurotrope's principal executive offices are located within this Judicial District.

19. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

20. Plaintiffs, as set forth in the previously submitted Certifications, acquired Neurotrope securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

21. Defendant Neurotrope is incorporated in Nevada, with principal executive offices located at 205 East 42nd Street, 16th Floor, New York, New York 10017. During the Class Period the Company's common stock traded on the OTCQB ("OTC") and NasdaqCM ("NASDAQ") markets under the symbol, "NTRP." NTRP shares currently trade on the NASDAQ.

22. Defendant Susanne Wilke ("Wilke") has served as the Company's Chief Executive Officer ("CEO") since September 2016 and as a member of the Company's Board of Directors since February 2016. Wilke has years of experience in the biotechnology industry, with a focus on the pharmaceutical, diagnostic and therapeutic fields. Dr. Wilke holds a B.A. in Chemistry from Loyola University, a Ph.D. in Organic Chemistry/Biochemistry and Drug Development from the University of Illinois and an M.B.A. from the Dartmouth Tuck School of Business.

23. Defendant Daniel Alkon, ("Alkon") has served as the Company's President since September 16, 2016. Alkon has served as the Company's Chief Scientific Officer since August 2013. Dr. Alkon received his undergraduate degree in chemistry from the University of Pennsylvania and his M.D. from Cornell University. He completed an internship in medicine at the Mt. Sinai Hospital in New York. He was a member of the staff of the National Institutes of Health for 30 years, and became a Medical Director in the U.S. Public Health Service at the

National Institute of Neurological Disorders and Stroke and Chief of the Laboratory of Adaptive Systems. In 1999, Dr. Alkon became the founding Scientific Director of the Blanchette Rockefeller Neurosciences Institute, where he occupied the Toyota Chair in Neuroscience. In this position, he and his team conducted multidisciplinary research on the molecular and biophysical mechanisms of memory and memory dysfunction in psychiatric and neurological disorders, particularly Alzheimer's disease. He was also a Professor at the Blanchette Rockefeller Neurosciences Institute and a Professor of Neurology at West Virginia University until September 2016.

24. Defendants Wilke and Alkon are collectively referred to herein as the "Individual Defendants" and, with Neurotrope, the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS: NEUROTROPE MISLED INVESTORS ABOUT THE EFFICACY OF BRYOSTATIN

### A. Background

25. Neurotrope was formed on August 23, 2013 through a merger with Neurotrope BioScience, Inc. Neurotrope was incorporated in Nevada. Neurotrope BioScience, Inc., which was incorporated in Delaware on October 31, 2012, is now a wholly owned subsidiary of Neurotrope. Neurotrope is a clinical stage biopharmaceutical company specializing in the development of therapeutics to treat neurodegenerative diseases, including Alzheimer's disease.

26. The Company's primary product candidate at all relevant times was Bryostatin-1. Bryostatin is isolated from the marine bryozoan Bugula neritina. According to Neurotrope, Bryostatin promotes protein kinase C isozyme epsilon ("PKCε"), which Neurotrope claims plays a role in the growth of synapses and in preventing synaptic loss that may correlate with cognitive impairment observed in Alzheimer's patients. Neurotrope also claims that Bryostatin-1

promotes anti-amyloid and anti-tangle signaling pathways in the brain and prevents neuronal death.

### B. Neurotrope Repeatedly Inflated Investors' Expectations About the Efficacy of Bryostatin

27. Even well before the start of the Class Period, Neurotrope repeatedly inflated investors' expectations about the efficacy of Bryostatin in combatting Alzheimer's. Prior to the start of the Class Period, the Company completed its Phase 1 and 2a studies preliminarily evaluating the safety and tolerability of Bryostatin. Neurotrope announced the results of its Phase 2a clinical study of Bryostatin in a March 17, 2015 press release titled "Neurotrope Announces Positive Final Results From Its Phase 2a Safety Study for the Treatment of Alzheimer's Disease."

28. The March 17, 2015 press release stated in relevant part:

> Neurotrope, Inc. [. . .] today announced secondary and exploratory endpoint results from its randomized, double-blind, placebo-controlled, single dose Phase 2a clinical trial evaluating bryostatin-1 for the treatment of Alzheimer's disease (AD).
>
> [. . .]
>
> **As a secondary objective, the Phase 2a safety study examined the correlation of the changes in PKCε with plasma levels of bryostatin after a single dose. Preliminary assessment of PKCε levels in peripheral monocytes demonstrated a significant increase in total PKC protein levels at the end of the bryostatin infusion consistent with target engagement.**
>
> [. . .]
>
> Warren W. Wasiewski, MD, Executive Vice President and Chief Medical Officer of Neurotrope, noted, "**Given these additional encouraging results**, we are actively planning our Phase 2b, multi-site, double-blind, placebo controlled trial of approximately 150 patients in moderately severe to severe AD patients."

(Emphasis added.)

29. Based on these results, the Company initiated a Phase 2b clinical trial designed to evaluate the safety, tolerability and efficacy of Bryostatin in the treatment of moderately severe to severe patients with Alzheimer's. The Phase 2b trial enrolled 147 patients in a randomized, double-blinded, placebo-controlled study and tested Bryostatin at two doses: 20 µg and 40 µg.

30. On January 7, 2016, Neurotrope issued a press release in which it announced that the Company was initiating its Phase 2b trial of Bryostatin and that the Company believed Bryostatin could be a "breakthrough" in the treatment of Alzheimer's. The Company stated in part:

> Neurotrope, Inc. [. . .] today announced the initiation of a Phase 2b clinical trial of lead candidate Bryostatin 1 for the treatment of Alzheimer's Disease.
>
> [. . .]
>
> "The initiation of this Phase 2b trial is an important milestone for Neurotrope and our lead compound, Bryostatin-1," said Charles Ramat, President and CEO of Neurotrope. "In a Phase 2a study, Bryostatin proved to be safe and well-tolerated, and demonstrated activation of the PKC epsilon target, which Neurotrope believes results in a cascade effect resulting in synaptogenesis. Damaged synapses are a hallmark of Alzheimer's Disease. **We believe that Bryostatin represents a potential breakthrough in the treatment of this debilitating disease, and look forward to further evaluating its clinical validity in this study."**
>
> The clinical trial will evaluate two different doses of Bryostatin (20 or 40µg) versus placebo, with a total of seven doses administered over 12 weeks . . . . The primary efficacy endpoint is based on Severe Impairment Battery (SIB) Scale, a benchmark assessment used extensively in severe Alzheimer's drug trials. Secondary efficacy endpoints include Activities of Daily Living (ADL), Neuropsychiatric Inventory (NPI) and Mini-Mental State Exam (MMSE).

(Emphasis added.)

31. On February 11, 2016, the Company announced that the first patient had been dosed with Bryostatin, and took the occasion, again, to inflate investor expectations about the likely efficacy of Bryostatin. In the announcement, Neurotrope's President and CEO at the time, Charles Ramat, stated: "We believe that Bryostatin represents a new and disruptive technology

in what has been an unsuccessful war against Alzheimer's disease . . . . We are excited at being on the cusp of providing a meaningful treatment to this suffering, severely impaired population and their caregivers."

### C. Neurotrope Shortened the Phase 2b Trial to Twelve Weeks, and Completed the Trial and Received Trial Results Months Before the Start of the Class Period

32. For "business reasons," on July 21, 2016, Neurotrope submitted an amended protocol to the FDA for the Phase 2b study, in which Neurotrope shortened the trial period to 12 weeks and planned for assessment of the efficacy (and safety and tolerability) of Bryostatin to occur at week 13. This amended protocol was approved on July 27, 2016.

33. On November 22, 2016, Neurotrope issued a press release announcing that the Company had completed enrollment for its first Phase 2b trial of Bryostatin. Neurotrope received the clinical results from the Phase 2b trial shortly after this date, and well before the start of the Class Period approximately three months later.

34. In the press release, Defendant Wilke again took the opportunity to tout the efficacy of Bryostatin. In relevant part, Defendant Wilke stated:

> Bryostatin's multi-modal mechanism of action not only targets the neuronal deficits of AD but also synaptic deficits. This combined mechanism of action through PKC epsilon activation gave the Company the confidence to commit to these trials in moderate to severe patients . . . . **We believe that we may have a breakthrough in Alzheimer's disease and other neurological disorders. With the recently completed financing, we believe that we are in a strong position to negotiate terms with pharmaceutical partners.**

(Emphasis added.)

### D. Defendants Blatantly Misled Investors by Stating that the Phase 2b Clinical Data Demonstrated Bryostatin Was Effective When, in Fact, the Data Failed To Show a Statistically Significant Effect

35. The results of the Phase 2b study clearly failed to demonstrate that Bryostatin-1 is effective at combatting Alzheimer's disease. While patients on the 20 μg dose at 13 weeks

showed a mean increase on the primary efficacy endpoint, the SIB, of 1.5, compared to a decrease in the placebo group of -1.1, for an improvement compared to the placebo of 2.6, crucially, this result was not statistically significant under broadly accepted industry standards for statistical significance in clinical trials. Specifically, the "p-value," *i.e.*, the probability that the same results would be found if the null hypothesis of the study question were true, was $p < 0.07$, significantly above the maximum p-value of $p < 0.05$ for statistical significance widely accepted in the medical industry for clinical trial results.

36. An expert in clinical trials and industry standards for statistical significance (the "Clinical Trial Expert" or "Expert") has confirmed that no reasonable investor familiar with clinical trials in the medical industry would understand drug trial results of $p < 0.07$ to be statistically significant, let alone to be evidence that the drug were "very effective." The Clinical Trial Expert has extensive experience with clinical drug trials. This Expert has an M.S. and Ph.D. in Biochemistry as well as an M.D., and has held academic positions over two decades at prestigious research universities. The Expert has extensive professional experience in conducting and reviewing clinical trials and their statistical significance, including over ten years of experience at the United States Food and Drug Administration ("FDA"), and has given numerous presentations regarding clinical trials as part of an FDA advisory committee. The Expert's publications, including publications regarding clinical trials, are extensive.

37. According to this Clinical Trial Expert, there is no genuine dispute in the medical industry that a p-value of $p < 0.05$ is the conventional, most widely accepted level for statistical significance in efficacy studies of drugs. Indeed, the FDA's May 1998 *Guidance for Industry: Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* explicitly refers to a p-value of $p < 0.05$ as the conventional level of statistical significance. As the Expert

has stated, "In over 10 years at the FDA as a primary, secondary, and tertiary medical reviewer, I cannot recall a single instance in which a sponsor proposed the use of a p-value other than $p < 0.05$ as the statistical significance level for an efficacy study."

38. Moreover, Neurotrope used a one-sided (one-tailed) test to determine the p-value in calculating the results of its Phase 2b trial. Such a one-sided test is not common because such tests do not address whether the test drug is actually worse than the control. Indeed, the FDA's September 1998 *Guidance for Industry: E9 Statistical Principles for Clinical Trials* explicitly states that use of one-sided tests, such as Neurotrope's (as opposed to conventional two-sided tests), should be prospectively justified, and that in the regulatory setting, the significance level for a one-sided test should be set at one-half of the conventional two-sided level maximum, *i.e.*, at $p < 0.025$. The Clinical Trial Expert has stated, "In over 10 years at the FDA as primary, secondary, and tertiary medical reviewer, I cannot recall a single instance in which a sponsor proposed the use of a one-sided test to determine the p-value for an efficacy study."

39. Nevertheless, at the start of the Class Period on January 30, 2017, Defendant Wilke announced at the Noble Financial Capital Markets' 13th Annual NobleCON Conference for investors that, based on "preliminary clinical . . . patient data" from the Phase 2b study, "we see remarkable results in the reversal of Alzheimer's." As explained above, the results of the Phase 2b study clearly failed to show that Bryostatin had a statistically significant effect on clinical measures of Alzheimer's disease.

40. Then, on February 13, 2017, after Neurotrope had additional time to analyze the results of the Phase 2b study, Neurotrope brazenly announced at the 2017 BIO CEO & Investor Conference:

> We are pretty excited about our upcoming Phase 2 top-line data in April 2017, as I said in moderate to severe Alzheimer's patients, which we believe will be a

> pivotal inflection point—valuation inflection point—for the Company . . . . We have extensive preclinical data, clinical data, and compassionate use data that leads us to believe that our mechanism of action can be very effective in reversing Alzheimer's disease.

41. These statements misled investors to believe that Neurotrope possessed statistically significant clinical data showing that Bryostatin-1 was effective in combatting Alzheimer's when, in fact, Neurotrope possessed no such data and the trial results actually showed no statistically significant effects. Neurotrope made additional misleading statements on March 24, 2017 suggesting that Neurotrope had "demonstrated" the efficacy of Bryostatin-1 in combatting Alzheimer's disease, when Neurotrope clearly had not made any such demonstration.

### E. Neurotrope Revealed Data Failing To Show that Bryostatin-1 Had Any Statistically Significant Effect on Alzheimer's Disease

42. Ultimately, Neurotrope had to reveal the true results of its Phase 2b clinical trial to investors. Neurotrope did so selectively, in piecemeal fashion. On May 1, 2017, Neurotrope issued a press release announcing what it claimed were "positive top-line results" of the pivotal Phase 2b trials of Bryostatin. However, the underlying trial data, which Neurotrope presented only in part, flatly contradicted Neurotrope's characterizations of the results as "positive." As explained above, Neurotrope's results for the 20 μg dosage of Bryostatin were not statistically significant, as the results had a p-value of $p < 0.07$:

> Among the patients who completed the protocol (n = 113), the patients on the 20 μg dose at 13 weeks showed a mean increase on the SIB of 1.5 vs. a decrease in the placebo group of -1.1 (improvement of 2.6) **(p < 0.07)** (n = 80) . . . .

(Emphasis added.)

43. Industry observers were not impressed. On May 1, 2017, industry analyst Adam Feuerstein published an article in *The Street* in which he stated:

> On Monday, Neurotrope issued a press release claiming "positive top-line results" from the bryostatin clinical trial, when in fact, the drug failed to produce a

> meaningful improvement in dementia, cognition or memory of Alzheimer's patients.
>
> [. . .]
>
> [T]here was a mean increase in the Severe Impairment Battery (SIB) of 1.5 points compared to a decrease in the placebo group of 1.1 points—a difference of 2.6 points that did not reach statistical significance.
>
> [. . .]
>
> [A] placebo-adjusted improvement in the SIB of 2.6 points at 3 months for bryostatin is not clinically meaningful.

44. Also on May 1, 2017, Elizabeth Balboa published an article in *Benzinga* titled, "Feuerstein on Neurotrope: The Study Failed and There Was Never 'A Lot of Hope Here.'" According to Balboa, "The results of the Phase 2 trial of Bryostatin-1 (0.07) fell short of the industry's accepted standard (0.05)—and that was after the firm adjusted its data. Neurotrope threw out a portion of its patients to examine a mere subgroup, still with statistically insignificant cognitive improvements."

45. Similarly, on May 3, 2017, Derek Lowe, a biochemist and industry expert, published an article titled "Neurotrope: A Shameful PR Stunt" in which Lowe stated what others in the industry already understood, that Neurotrope's Phase 2b clinical trial had failed to produce statistically significant results:

> The p-value among patients who completed the therapy was < 0.07. Most statisticians with any dignity refer to values above 0.05 as "not significant." This is embarrassing stuff. [. . .]

46. Lowe also noted that the improvement on the SIB that Neurotrope had touted was clinically insignificant: "2.6 points [on the SIB] is not clinically meaningful."

47. On news that Neurotrope had failed to demonstrate that the 20 µg dose of Bryostatin had a statistically significant effect on clinical measures of Alzheimer's disease under

broadly accepted industry standards for statistical significance, Neurotrope's share price fell by approximately 63%.

48. However, in its May 1, 2017 press release, Neurotrope had continued to mislead the public about the efficacy of Bryostatin by continuing to tout the purported benefits of Bryostatin, while failing to disclose any data from its study of the 40 µg dose of Bryostatin, data that further contradicted Neurotrope's claims.

49. On July 19, 2017, Neurotrope finally presented the full results of its Phase 2 study of Bryostatin-1, including the results of the Phase 2b trial using a 40 µg dosage, and revealed to investors for the first time that "there was no therapeutic signal observed with the 40 µg dose." On this news, Neurotrope's share price fell by approximately 24%.

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

50. On January 30, 2017, Neurotrope's CEO, Defendant Wilke, announced in a presentation at the Noble Financial Capital Markets' 13th Annual NobleCON Conference, an investor conference, that:

> We have upcoming phase 2 topline data be release [sic] in April 2017 as I said in a moderate to severe Alzheimer's population **because we believe that we can reverse Alzheimer's even in an advanced form of the disease**.
>
> […]
>
> For us however it's very good because we are using only a fraction of the dose used in cancer and **we see remarkable results in the reversal of Alzheimer's**. We have extensive preclinical data where this model was developed and **we have preliminary clinical and compassionate use patient data**.

(Emphasis added.)

51. Upon the news, the stock increased $1.83, or 19%, from $9.75 per share on January 27, 2017 to $11.58 per share on January 30, 2017 on unusually heavy trading volume.

52. The statements referenced in ¶ 50 above were materially false and/or misleading when made because: (i) the "clinical . . . data" in Defendants' possession, including results from the Phase 2b clinical trial of Bryostatin-1, failed to show that Bryostatin-1 had a statistically significant effect on clinical measures of Alzheimer's disease under broadly accepted industry standards for statistical significance, and so Defendants did not "see remarkable results in the reversal of Alzheimer's"; and (ii) Defendants did not disclose that the "clinical . . . data" in their possession, including results from the Phase 2b clinical trial of Bryostatin-1, failed to show that Bryostatin-1 had a statistically significant effect on clinical measures of Alzheimer's disease under broadly accepted industry standards for statistical significance, while a reasonable investor would understand from Defendants' statement that such data indicated that the drug, at a minimum, had such a statistically significant effect.

53. On February 13, 2017, Defendants Wilke and Alkon presented at the 2017 BIO CEO & Investor Conference (the "Conference") at the Waldorf Astoria Hotel in New York, New York. At the Conference, Defendant Wilke spoke regarding the Phase 2b trial as well as about the resulting top-line data. Specifically, Wilke stated, in pertinent part that:

> "We are pretty excited about our upcoming Phase 2 top-line data in April 2017, as I said in moderate to severe Alzheimer's patients, which we believe will be a pivotal inflection point—valuation inflection point—for the Company . . . . **We have extensive** preclinical data, **clinical data**, and compassionate use data **that leads us to believe that our mechanism of action can be very effective in reversing Alzheimer's disease.**"

(Emphasis added.)

54. Upon the news, the stock increased $1.65, or 12%, from $13.35 per share on February 10, 2017 to $15.00 per share on February 13, 2017.

55. The statements referenced in ¶ 53 above were materially false and/or misleading when made because: (i) Defendants did not disclose that the "extensive . . . clinical data" in their

possession, including results from the Phase 2b clinical trial of Bryostatin-1, failed to show that Bryostatin-1 had a statistically significant effect on clinical measures of Alzheimer's disease under broadly accepted industry standards for statistical significance, while a reasonable investor would understand from Defendants' statement that such data indicated that the drug, at a minimum, had such a statistically significant effect; and (ii) Defendants did not believe that the "extensive . . . clinical data" in their possession indicated that Bryostatin-1 was "very effective" in reversing Alzheimer's disease.

56. Alternatively, the statements referenced in ¶ 53 above were materially false and/or misleading because if Defendants did not have results from the Phase 2b clinical trial of Bryostatin-1 in their possession at the time, Defendants' statement in this context that they had "extensive . . . clinical data" in their possession would lead a reasonable investor to believe that Defendants did, in fact, have results from the Phase 2b clinical trial in their possession, and that such results indicated that Bryostatin, at a minimum, had a statistically significant effect on clinical measures of Alzheimer's disease under broadly accepted industry standards for statistical significance, when in fact they did not.

57. On March 24, 2017, Neurotrope issued a press release announcing that Defendant Alkon would present at the Sachs Associates' 2nd Neuroscience BioPartnering and Investment Forum held at the New York Academy of Sciences in New York, New York. In the press release, Defendant Alkon affirmatively touted Bryostatin's efficacy, stating that:

> "Bryostatin-1 **has demonstrated** the potential to prevent neuronal death as well as the well-known brain pathologies, amyloid plaques and neurofibrillary tangles. **Bryostatin's multiple efficacies**, collectively provide an unprecedented opportunity to treat neurodegeneration with a regenerative medicine approach. The Neuroscience BioPartnering & Investment Forum provides a great opportunity to discuss the exciting advances being made in the science of neurodegenerative diseases, promising treatments under development, and bryostatin's position in the arena."

(Emphasis added.)

58. The statements referenced in ¶ 57 above were materially false and/or misleading when made because the purported potential of Bryostatin-1 "to prevent neuronal death as well as the well-known brain pathologies, amyloid plaques and neurofibrillary tangles" has never been demonstrated in humans, by Neurotrope or any other entity.

59. On May 1, 2017, Neurotrope issued a press release titled "NEUROTROPE Announces Positive Top-Line Results from Phase 2 Study of Bryostatin-1 for Moderate to Severe Alzheimer's Disease." The report asserted that the results of the Phase 2b trial showed Bryostatin was effective in treating patients with moderate to severe Alzheimer's disease.

60. The press release stated in relevant part:

> "Neurotrope, Inc. [. . .] today announced positive top-line results from its Phase 2 study (-202 Study) of Bryostatin-1 in patients with moderate to severe Alzheimer's disease (AD) . . . .
>
> [. . .]
>
> This Phase 2 study was the first repeat dose study of Bryostatin-1 in patients with late stage AD (defined as a Mini Mental State Exam 2 (MMSE-2) of 4-15), in which **two dose levels of Bryostatin-1** were compared with placebo to assess safety and preliminary efficacy ($p < 0.1$, one-tailed) after 12 weeks of treatment.
>
> [. . .]
>
> Among the patients who completed the protocol ($n = 113$), **the patients on the 20 µg dose at 13 weeks showed a mean increase on the SIB of 1.5 vs. a decrease in the placebo group of -1.1 (improvement of 2.6) ($p < 0.07$)** . . . .
> [. . .]
>
> **Together these results indicate**, in this relatively small trial, **that Bryostatin-1, at the 20 µg dose, improved outcomes in important dimensions** that are impaired in patients with moderate to severe Alzheimer's disease i.e., cognition and the ability to care for oneself.
>
> [. . .]
>
> 'The results of this relatively small randomized, double-blind, placebo controlled study of Bryostatin-1 shows that **Bryostatin-1 has the potential to positively**

> **impact the lives of these severely debilitated patients** with moderate to severe AD, a population that is in dire need of new therapies, especially drugs with a new mechanism of action,' said Dr. Susanne Wilke, Neurotrope's Chief Executive Officer. 'We are excited to take the next steps in advancing the development of Bryostatin-1 to treat this serious disease that every year becomes a larger and larger public health burden in the U.S. and around the world. Additional development, with a path to Phase 3, is clearly warranted.'
>
> **'These results, which show improvement in patients with moderate to severe Alzheimer's disease, the population that is generally recognized as the most difficult to treat, provide exciting evidence of a new therapeutic approach potentially could rejuvenate synaptic networks in the brain.** Improvements across the range of important manifestations of the underlying neurodegenerative disease, as shown in this Phase 2 study, could potentially represent a shift in the paradigm to treat Alzheimer's disease,' said Dr. Daniel Alkon, President and Chief Scientific Officer of Neurotrope.

(Emphasis added.)

61. The statements referenced in ¶¶ 59-60 above were materially false and/or misleading when made because: (i) the Phase 2b clinical trial of Bryostatin-1 failed to demonstrate that the drug had a statistically significant effect on clinical measures of Alzheimer's disease under broadly accepted industry standards for statistical significance, so top-line results from the Phase 2b trial were not "positive"; and (ii) in announcing these purportedly "positive" Phase 2b results, Defendants did not disclose that the results of the Phase 2b trial using a 40 µg dosage failed to show any clinically statistically significant effect on clinical measures of Alzheimer's disease under broadly accepted industry standards for statistical significance and, accordingly, failed to disclose information that would lead a reasonable investor to question further whether the mechanism of action of Bryostatin-1 was effective as claimed.

## VI. LOSS CAUSATION

62. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

63. Throughout the Class Period, the price of the Company's securities was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified herein.

64. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**A. May 1, 2017**

65. On May 1, 2017, Neurotrope issued a deceptive press release titled "NEUROTROPE Announces Positive Top-Line Results from Phase 2 Study of Bryostatin-1 for Moderate to Severe Alzheimer's Disease." The press release asserted that the results of the Phase 2b trial were significant with regard to Bryostatin's efficacy in treating patients with moderate to severe Alzheimer's disease. The press release stated in part:

> Neurotrope, Inc. [. . .] today announced positive top-line results from its Phase 2 study (-202 Study) of Bryostatin-1 in patients with moderate to severe Alzheimer's disease (AD), a population not commonly targeted in AD clinical trials.
>
> [. . .]
>
> Among the patients who completed the protocol (n = 113), **the patients on the 20 µg dose at 13 weeks showed a mean increase on the SIB of 1.5 vs. a decrease in the placebo group of -1.1 (improvement of 2.6) (p < 0.07) . . . .**

(Emphasis added.)

66. On this news, Neurotrope's share price fell $11.84, or 62.95%, to close at $6.97 on May 1, 2017, on unusually heavy trading volume.

**B. July 19, 2017**

67. On July 19, 2017, Neurotrope presented the full results of its Phase 2 study of Bryostatin-1, including the results of the Phase 2b trial using a 40 µg dosage, at the Alzheimer's

Association International Conference 2017 in London in a presentation titled, "Effect of Bryostatin-1 on Cognition and Daily Living Tasks in Moderate to Severe Alzheimer's disease Preliminary Report of a Phase 2 Study."

68. Neurotrope issued a press release the same day, which stated, in relevant part:

> Neurotrope, Inc. [. . .] today presented clinical results from its recently completed Phase 2 trial demonstrating that moderate-to-severe Alzheimer's disease (AD) patients treated with 20 µg bryostatin-1 showed preliminary evidence of sustained improvement in cognition compared to placebo.
>
> [. . .]
>
> **Unlike the 20 µg dose, there was no therapeutic signal observed with the 40 µg dose.**
>
> [. . .]
>
> Patients dosed with 20 µg had a dropout rate similar to placebo, while patients dosed at 40 µg experienced poorer safety and tolerability, and had a higher dropout rate. Treatment emergent adverse events (TEAEs) were mostly mild or moderate in severity. TEAEs, including serious adverse events, were more common in the 40 µg group, as compared to the 20 µg and placebo groups.

(Emphasis added.)

69. On this news, Neurotrope's share price dropped 24% to close at $5.80 on July 20, 2017, on unusually heavy trading volume.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

70. Neurotrope, Wilke and Alkon each knew that Neurotrope misrepresented the efficacy of Bryostatin-1 during the Class Period, and each knew the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

71. Neurotrope is a very small company; during the Class Period, only around five individuals worked at Neurotrope, including Defendants Wilke and Alkon. Accordingly, all officers and directors of Neurotrope, including Wilke and Alkon, knew all material information about the Company's primary drug, Bryostatin-1.

72. Defendant Wilke served as CEO and as a Director of Neurotrope throughout the Class Period. As CEO, Wilke was the head of Neurotrope's management and operations. Wilke, by virtue of her responsibilities and activities as CEO and Director of the Company, was privy to all material information concerning Neurotrope's studies of its primary drug, Bryostatin-1. As CEO of a five person company, Wilke would have received any material information about the efficacy of Bryostatin-1 directly, or else immediately after any other employee at Neurotrope received that information. As CEO of a company primarily engaged in clinical-stage medical research, and given Wilke' s extensive scientific background described above in Part III, Wilke knew or was reckless in not knowing the standard for the statistical significance of clinical trial results that is most widely accepted and used in the clinical-stage medical research industry.

73. Likewise, Alkon, as President and Chief Scientific Officer, was privy to all material information concerning Neurotrope's studies of its primary drug, Bryostatin-1, and would have received any material information concerning the efficacy of Bryostatin-1 directly, or else immediately after any other employee at Neurotrope received that information. As President and Chief Scientific Officer of a company primarily engaged in clinical-stage medical research, and given Alkon's extensive scientific background described above in Part III, Alkon knew or was reckless in not knowing the standard for the statistical significance of clinical trial results that is most widely accepted and used in the clinical-stage medical research industry.

74. Patient treatment in the Phase 2b study was completed on November 22, 2016. In Neurotrope's contract with the company conducting the Phase 2b study, Worldwide Clinical Trials (attached to Neurotrope's October 25, 2015 Current Report on Form 8-K), this company agreed to "Prepare and distribute regular study progress reports" to Neurotrope. Accordingly,

Neurotrope, Wilke and Alkon would have had data from the Phase 2b study well before the start of the Class Period on January 30, 2017.

75. Indeed, Defendant Wilke, speaking on behalf of Neurotrope in her presentation to investors on February 13, 2017 discussing the upcoming revelation of top-line results of the Phase 2b study, admitted that she possessed "extensive . . . clinical data" that led Neurotrope "to believe that [its] mechanism of action can be very effective in reversing Alzheimer's disease."

76. The core of Neurotrope's business is the development of Bryostatin-1. Accordingly, Neurotrope and the Individual Defendants were privy to all material information concerning the efficacy of this drug.

77. Defendants had a motive to exaggerate the success of Bryostatin. Bryostatin was Neurotrope's only drug product candidate, so the success of the Company hinged on the clinical success of this product.

78. Indeed, Neurotrope insiders appear to have promoted Neurotrope stock in what has been described by industry observers as a "pump and dump" scheme. On May 3, 2017, Adam Feuerstein published an article in *Seeking Alpha* titled "A Neurotrope Stock Promotion Scheme is Underway, but Who's Paying for It?" The article explained that articles written by Sharon di Stefano, a sell-side analyst, were turned into paid, promotional press releases distributed over a newswire service. Neither Feuerstein nor di Stefano knew who was responsible for paying for the promotional press releases.

79. The following day, on May 4, 2017, an analyst who goes by the name "Unemon1" published an article in *Seeking Alpha* titled, "Behind Neurotrope, Clear and Overwhelming Links to Fraudsters," which further described how Neurotrope promoted its stock price.

80. By virtue of their high-level positions, Wilke and Alkon's knowledge may be imputed to Neurotrope.

## VIII. CLASS ACTION ALLEGATIONS

81. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Neurotrope securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

82. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Neurotrope securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Neurotrope or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

83. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

84. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

85. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Neurotrope;
- whether the Individual Defendants caused Neurotrope to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of Neurotrope securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

86. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

87. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;

- Neurotrope securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ and was covered by analysts;
- a cause and effect relationship existed between unexpected Company events and an immediate change in the Company's stock price;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiffs and members of the Class purchased, acquired and/or sold Neurotrope securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

88. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

89. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. NO SAFE HARBOR

90. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking

statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Neurotrope who knew that the statement was false when made.

## X. COUNT ONE

**<u>Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants</u>**

91. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

92. During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above. Defendants knew that such statements, when made, were false and misleading, or were reckless in their disregard as to the truth of such statements, which contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

93. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs in connection with its purchases of Neurotrope securities during the Class Period.

94. Plaintiffs have suffered damages in that, in reliance on Defendants' statements and the integrity of the market, they paid artificially inflated prices for Neurotrope's securities. Plaintiffs would not have purchased such securities at the prices they paid, or at all, if they had been aware that the market prices of such securities had been artificially and falsely inflated by Defendants' misleading statements.

95. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of Neurotrope's securities during the Class Period.

## XI. SECOND CLAIM

**<u>Violation of Section 20(a) of The Exchange Act Against the Individual Defendants</u>**

96. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

97. During the Class Period, the Individual Defendants participated in the operation and management of Neurotrope, and conducted and participated, directly and indirectly, in the conduct of Neurotrope's business affairs. Because of their senior positions, they knew the adverse non-public information about Neurotrope's misstatement of income and expenses and false financial statements.

98. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Neurotrope's financial condition and results of operations, and to correct promptly any public statements issued by Neurotrope which had become materially false or misleading.

99. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Neurotrope disseminated in the marketplace during the Class Period concerning Neurotrope's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Neurotrope to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Neurotrope within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Neurotrope securities.

100. Each of the Individual Defendants, therefore, acted as a controlling person of Neurotrope. By reason of their senior management positions and/or being directors of Neurotrope, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Neurotrope to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Neurotrope and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

101. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Neurotrope.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Appointing Plaintiffs as representatives for the Class and their counsel as class counsel for the Class;

C. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Such other and further relief as the Court may deem just and proper.

## XIII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury in this action.

Dated: October 9, 2017

Respectfully submitted,

LEVI & KORSINSKY LLP

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins (SH-1887)
733 Summer Street, Suite 304
Stamford, CT 06901
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

POMERANTZ LLP

Jeremy A. Lieberman
Austin P. Van
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
avan@pomlaw.com

***Attorneys for Lead Plaintiffs***